Filed 6/9/15

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ERIC GEOVANIE GARCIA et al.,<br><br>    Defendants and Appellants. | E057279<br><br>(Super.Ct.No. SWF021408)<br><br>**OPINION** |

APPEAL from the Superior Court of Riverside County. Angel M. Bermudez, Judge. Affirmed as modified, with directions.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant Eric Geovanie Garcia.

Law Offices of Allen G. Weinberg and Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant Joseph Navarro.

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III, IV.C, V.B., VI, VII, IX, X, and XI.

J. Courtney Shevelson, under appointment by the Court of Appeal, for Defendant and Appellant Samuel Navarro.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Barry Carlton and Sharon L. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants are all related.  Defendants Samuel Navarro and Joseph Navarro are brothers.  Defendant Eric Garcia is the brother of Lizbeth Robles, who is Samuel Navarro's girlfriend; thus, Garcia is Samuel Navarro's de facto brother-in-law.

At one time, Garcia and Joseph Navarro were friends with Luis Arceo, who lived next door to Samuel Navarro.  However, during a party at Arceo's home, Arceo got into a fistfight with them.  Garcia threatened to "get" Arceo.

About two weeks later, there was another party at Arceo's home.  After midnight, when most of the guests had left, defendants and a group of their friends and relatives came over to Arceo's property.  Garcia confronted Arceo, called him a "bitch" and a "rat," and threatened to kill him.

Meanwhile, Robles and/or Joseph Navarro, along with others, accosted one of the party guests.  Either Robles or Joseph Navarro threw the first punch.  After that, each of the three defendants was seen with a knife, and each was seen hitting or stabbing someone.  By the time defendants left, three party guests had been stabbed.  Two died; one survived.

After a jury trial, Garcia and Joseph Navarro were found guilty on two counts of first degree murder and sentenced to 50 years to life in prison. Samuel Navarro was likewise found guilty on two counts of first degree murder; in addition, however, solely as to him, a multiple-murder special circumstance was found true, and he was found guilty on one count of unpremeditated attempted murder. He was sentenced to life without the possibility of parole, plus nine years.

Defendants now contend:

1. The trial court erred by failing to instruct that provocation can reduce first degree murder to second degree murder.

2. The trial court erred by instructing on the legally impossible theory of conspiracy to commit attempted murder.

3. The trial court erred by instructing on the legally impossible theory of conspiracy to commit second degree implied malice murder.

4. The trial court erred by instructing that a "direct" aider and abettor could be guilty of premeditated first degree murder even if he did not personally premeditate.

5. The trial court erred by instructing that, under the natural and probable consequences doctrine, an aider and abettor could be convicted of first degree murder as long as "[m]urder" was a natural and probable consequence of the target offense.

6. The natural and probable consequences doctrine is unconstitutional.

7. The prosecutor committed misconduct by misstating the law in closing argument.

3

8.  Because Garcia and Joseph Navarro were juveniles when the crimes were committed, their sentences of 50 years to life constitute cruel and unusual punishment.

9.  The trial court miscalculated Joseph Navarro's pretrial actual custody credit.

10.  The trial court erred by imposing a parole revocation restitution fine on Garcia and Joseph Navarro in the amount of $10,000.

11.  The abstract of judgment is erroneous because it fails to reflect the fact that the trial court ordered direct victim restitution liability to be joint and several.

As the People concede, the contentions regarding pretrial actual custody credit and the parole revocation restitution fine are well-taken.  We will modify the judgment accordingly.  Otherwise, we find no prejudicial error.

I

FACTUAL BACKGROUND

A.	*Introduction*.

The issues raised in this appeal largely turn on which of the defendants stabbed which of the victims and on defendants' respective mental states at the time. Accordingly, we highlight the facts relating to those matters; we pretermit the facts relating to whether defendants actually stabbed anybody at all.

B.    *May 12-13, 2007:  The Mother's Day Party*.

Defendant Samuel Navarro and Lizbeth Robles, the mother of his child, lived in a converted barn on Ritter Avenue in Homeland.  Luis Arceo  and his family lived in a trailer next door to the barn.

On May 12-13, 2007 — Mother's Day — there was a party at the trailer.  At the time, Arceo was 16.  Those attending the party included defendant Joseph Navarro, then aged 17, who was Samuel Navarro's younger brother.  They also included defendant Eric Garcia, also aged 17, who was Robles's brother.  Arceo considered both Garcia and Joseph Navarro to be his friends.

Future victim Miguel Salas, then aged 18 or 19, was also at the party.  During a card game, Salas's girlfriend asked for another card by saying, "Hit me."  Joseph Navarro responded with the double entendre, "I'd hit that."  After he said this several times, Salas admonished him to be respectful.  Garcia intervened, saying, "If you have a problem with Joe, then you have a problem with me."

Garcia challenged Salas to a fight.  All four youths went outside.  Garcia punched Salas in the face.  After about a minute of one-on-one fighting, Joseph Navarro jumped in and started hitting Salas from behind.  Arceo thought this was unfair, so despite his friendship with Garcia and Joseph Navarro, he jumped in on Salas's side.

Garcia was mad at Arceo.  He threatened to "get" Arceo and said that Arceo was going to "pay."  After the fight, Samuel Navarro and Robles arrived; they took Joseph Navarro and Garcia back to the barn.

5

Later, as Salas was leaving, Garcia and Joseph Navarro returned, this time accompanied by Samuel Navarro. They started hitting Salas again. This time, Arceo's sister called the police; Arceo spoke to them. By the time the police arrived, the fight was over.

After this incident, Arceo stopped hanging out with Garcia and Joseph Navarro.

C.      *May 27-28, 2007: The Birthday Party*.

On May 27-28, 2007, a birthday party for Arceo's younger sister was held at the trailer.

Around 12:40 a.m., after most of the guests had left, Garcia, Joseph Navarro, Samuel Navarro, Robles, and others associated with them walked over toward the trailer area. Garcia yelled, "I want [Salas] and [Arceo] up here." He called Arceo a "bitch" and a "rat."[1] He added, "I'm gonna kill you." He was jumping up and down and staring at Arceo. He yelled "Paramount." Samuel Navarro similarly shouted "East Side Paramount" and "East Los." Arceo started "screaming things back at them." He "cocked his hands up" and said, "I'm right here." He, too, was jumping up and down.

Robles and other members of defendants' group walked up to party guest Juan Pablo Medina Martinez.[2] Martinez said they were being disrespectful. He added, "Calm

_____

[1]      According to some witnesses, there had been a similar incident earlier that evening, in which Garcia had come over to the trailer area, called Arceo names, and then left.

[2]      According to Martinez and another witness, Joseph Navarro was *not* in this group.

down.  There's kids here."[3]  Robles replied, "I don't give a fuck.  My kids are here, too."

She then "socked" Martinez in the face.  Martinez pushed her down.[4]

"They all" started hitting Martinez.  Samuel Navarro either hit or stabbed him in

the stomach.  Two other people also hit or stabbed him.[5]  Martinez fell to the ground.

Samuel Navarro tried to stab him in the face, but he put up his left arm to block the blow;

as a result, he was stabbed in the left wrist.

"[E]verybody started running."  Among others, Salas and party guest Brice

Moreno (aged 20) tried to run away.  Garcia and Joseph Navarro — both holding knives

— chased after them.

Garcia caught up with Moreno and hit or stabbed him from behind.  Moreno

screamed and fell to the ground.  He said, "No, please, stop.  I got two kids."  Garcia

stood over him and continued to hit or stab him.  Joseph Navarro also started hitting or

stabbing Moreno.

---

**3**     One witness recalled Martinez as saying, "Calm the fuck down, bitch, or I'll fuck you guys up[.]"  Martinez admitted that, at some point, he called Robles a bitch.

**4**     Arceo gave a very different account of how the fight started.  He testified that Joseph Navarro "bang[ed] on" Martinez by saying "BN" (Brown Nation).  Martinez "bang[ed] back" by saying "BPM" (Brown Pride Malditos) and throwing gang signs.  It was Joseph Navarro who threw the first punch; he took a swing at Martinez, but it may not have connected.  Martinez then knocked Joseph Navarro down.  Joseph Navarro immediately got back up and started either hitting or stabbing Martinez.

**5**     Martinez testified that these two people were *not* Garcia or Joseph Navarro.

Arceo testified that both Garcia  and Joseph Navarro hit or stabbed Martinez.  However, he had told police that it was Robles and another man who stabbed Martinez.

Salas came up behind Garcia and started punching him, saying, "Leave [Moreno] alone."  Garcia turned around and hit or stabbed Salas in the torso.  Salas fell to the ground.  Samuel Navarro "[got] on top of [Salas]" and hit or stabbed him in the hip.

Garcia was holding "a knife that was full of blood."  He called Arceo's name.  Arceo said, "I'm right here."  Garcia said, "I found you, bitch."  On seeing the knife, Arceo ran; Garcia chased him, but he got away.

Meanwhile, Martinez got up and walked out to the street.  He saw Garcia walking back toward the trailer, holding a knife.  Garcia asked, "Do you want me to kill you?"  Martinez replied, "I was already stabbed . . . .  Let me die."  Garcia kept walking.

Martinez lay down and started to pass out.  Suddenly, Robles punched him in the mouth and screamed, "That's what you get, motherfucker."  Someone else heard Robles say, "That's what you guys get for disrespecting and being cop callers."

Defendants got into Samuel Navarro's car and left.  Samuel Navarro was smiling and laughing.

When the police arrived, they asked Salas, "Who stabbed you?"  He pointed toward the barn.

Salas died from a single stab wound to the left chest.  He also had a second, nonfatal stab wound in the left hip.

Moreno had only a single stab wound, to the chest, which proved fatal.[6]

---

[6]    In closing argument, the prosecutor conceded, "Brice Moreno was stabbed one time.  It's impossible to sit here today . . . and say:  Who?  Who did that?  Which particular person inflicted that injury?"

8

Martinez was hospitalized for over three weeks, but he survived. He had one stab wound in his stomach and another in his left armpit; both of these were "life-threatening." In addition to the stab wound in the left wrist, mentioned earlier, he had relatively minor stab wounds to his back and legs.

At the scene, the police found two Frost Cutlery brand knives on the ground. However, when these knives were tested for blood, no blood was found on them. One empty Frost Cutlery knife box was also found at the scene.

Inside the barn, the police found three more empty Frost Cutlery knife boxes. Samuel Navarro's fingerprint was on one of these boxes.

Finally, in a box in the garage of the barn, the police found "assorted" Frost Cutlery knives, still in boxes.[7]

The next day, Garcia turned himself in. Samuel Navarro and Joseph Navarro, however, immediately fled the area. Five months later, Samuel Navarro was arrested in Los Banos (in the Central Valley). At first, he gave the police a false name. Almost two years after the incident, Joseph Navarro was arrested in Arizona. He, too, initially gave the police a false name.

---

[7] Samuel Navarro testified that he made extra money by selling knives on the side.

II

PROCEDURAL BACKGROUND

After a jury trial, all three defendants were found guilty on count 1 (murder of Salas) and count 2 (murder of Moreno). (Pen. Code, § 187, subd. (a).) Both murders were found to be of the first degree. (Pen. Code, § 189.) A multiple murder special allegation (Pen. Code, § 190.2, subd. (a)(3)) was found true as to Samuel Navarro but not true as to the other two defendants. Similarly, Samuel Navarro was found guilty on count 3 (attempted murder of Martinez), but the other two defendants were found not guilty. (Pen. Code, § 187, subd. (a), 664). The jury found that the attempted murder was not premeditated, willful, and deliberate. (Pen. Code, § 664.)

III

FAILURE TO INSTRUCT ON PROVOCATION

AS RELEVANT TO REDUCE THE DEGREE OF MURDER

Defendants contend the trial court erred by failing to instruct that provocation can reduce first degree murder to second degree murder. (E.g., CALCRIM No. 522.)

A. *Additional Factual and Procedural Background.*

The jury was instructed that provocation can reduce murder to voluntary manslaughter. (CALCRIM No. 570.) It was also instructed on the differences between first and second degree murder. (CALCRIM Nos. 520 & 521.)

All three defendants made a written request for CALCRIM No. 522. The trial court prepared a "Selected Instructions List," which included CALCRIM No. 522.

10

During the instructions conference, however, when reciting the list of instructions that it would and would not give, the trial court did not mention this instruction either way.

After the conference, the trial court noted, "I think some instructions that were requested by the defense were withdrawn after discussion, but I don't know if there w[ere] any that you want to make a record on that were not withdrawn but just not given." Counsel for all three defendants said no.

Thus, the trial court did not give CALCRIM No. 522. That instruction would have stated: "Provocation may reduce a murder from first degree to second degree . . . . The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

B.    *Analysis.*

CALCRIM No. 522 is a "pinpoint" instruction, meaning that the trial court is not required to give it except on request. (*People v. Rogers* (2006) 39 Cal.4th 826, 877-880 [discussing CALJIC No. 8.73, the predecessor of CALCRIM No. 522].)

The record indicates that, while defendants' trial counsel initially requested CALCRIM No. 522, they later withdrew the request. As the trial court stated in open court, they did withdraw their requests for some instructions. The fact that, at the instructions conference, the trial court did not mention CALCRIM No. 522 (and defense counsel did not point out that omission) indicates that it was one of the instructions withdrawn. This is confirmed by the fact that, when the trial court asked if it was *not*

11

giving any instructions that had *not* been withdrawn, all three defense counsel denied this.

Defendants do not argue that their counsels' withdrawal of CALCRIM No. 5.22 constituted ineffective assistance; it was not.

"When challenging a conviction on grounds of ineffective assistance, . . . the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.  Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.  When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. . . .  On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

The penalty for first degree murder (even absent special circumstances) is 25 years to life in prison.  The penalty for second degree murder is 15 years to life in prison.  (Pen. Code, § 190, subd. (a).)  This meant that if a defendant was convicted of murder at all, regardless of the degree, he was facing the possibility of spending the rest of his life in prison.  By contrast, the penalty for voluntary manslaughter is only three, six, or eleven

years in prison.  (Pen. Code, § 193, subd. (a).)  Thus, to the extent that there was any evidence of provocation at all, defense counsel could rationally prefer to use it to argue voluntary manslaughter rather than second degree murder.

We conclude that defendants have not shown that the trial court erred by failing to give CALCRIM No. 522.

IV

CONSPIRACY INSTRUCTIONS

Defendants raise two related challenges to the conspiracy instructions.

A.    *Additional Factual and Procedural Background*.

At the request of the prosecution,[8] the trial court gave the following conspiracy instructions:

1.  CALCRIM No. 416, "Evidence of Uncharged Conspiracy":

"The People have presented evidence of a conspiracy.  A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy.

"To prove that a defendant was a member of a conspiracy in this case, the People must prove that:

---

[8]    In their written request, all three defendants also requested conspiracy instructions.  At the instructions conference, however, defendants objected "to all of the conspiracy instructions."

13

"1.  The defendant intended to agree and did agree with one or more of the other defendants to commit *murder and/or attempted murder*;

"2.  At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit murder and/or attempted murder;

"3.  One of the defendants or all of them committed at least one of the following overt acts to accomplish *murder and/or attempted murder*:  armed themselves on or about May 28, 2007; and/or confronted a group of individuals . . . on or about May 28, 2007; and

"4.  At least one of these overt acts was committed in California.  [¶]  . . .

"To decide whether a defendant and one or more of the other alleged members of the conspiracy intended to commit murder and/or attempted murder, please refer to the separate instructions that I will give you on those crimes.

"The People must prove that the members . . . of the alleged conspiracy had an agreement and intent to commit murder and/or attempted murder.  The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit one or more of those crimes.  An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

"An overt act is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime.  The overt act must happen after the

14

defendant has agreed to commit the crime.  The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself.

"You must decide as to each defendant whether he was a member of the alleged conspiracy.

"The People contend that the defendants conspired to commit one of the following crimes: *Murder and/or attempted murder*.  You may not find a defendant guilty under a conspiracy theory unless all of you agree that the People have proved that the defendant conspired to commit at least one of these crimes, and you all agree which crime he conspired to commit.  You must also all agree on the degree of the crime."  (Italics added.)

2.  CALCRIM No. 417, "Liability for Coconspirators' Acts":

"A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime.

"A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy.  This rule applies even if the act was not intended as part of the original plan.  Under this rule, a defendant who is a member of the conspiracy does not need to be present at the time of the act.

15

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

"A member of a conspiracy is not criminally responsible for the act of another member if that act does not further the common plan or is not a natural and probable consequence of the common plan.

"To prove that the defendant is guilty of the crime[s] charged in Counts 1 through 3 [*sic*], the People must prove that:

"1. The defendant conspired to commit one of the following crimes: assault with a deadly weapon and/or assault with force likely to produce great bodily injury;

"2. A member of the conspiracy committed murder to further the conspiracy, and

"3. Murder was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit."

B.     *Instructions on the Legally Impossible Theory of Conspiracy to Commit Attempted Murder.*

Defendants contend the trial court erred by instructing on the legally impossible theory of conspiracy to commit attempted murder.

The crime of conspiracy to commit attempted murder does not exist. "This is because the crime of attempted murder requires a specific intent to actually commit the murder, while the agreement underlying [such a] conspiracy . . . contemplate[s] no more than an ineffectual act. No one can simultaneously intend to do and not do the same act,

16

here the actual commission of a murder." (*People v. Iniguez* (2002) 96 Cal.App.4th 75, 79.) "Stated another way, under a traditional conspiracy approach, one cannot conspire to *try* to commit a crime. An agreement to commit a crime is required, even if nothing more than an overt act is ultimately done." (*People v. Johnson* (2013) 57 Cal.4th 250, 264.)

Here, the jury was not dealing with conspiracy as a substantive offense (Pen. Code, § 182), but rather with conspiracy as a theory of vicarious criminal liability. (See *In re Y.R.* (2014) 226 Cal.App.4th 1114, 1121.) Nevertheless, for the reasons stated in *Iniguez* and *Johnson*, a conspiracy to commit attempted murder is likewise a legal impossibility.

The People concede the error but argue that it was harmless. We agree.

"'A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one. [Citations.]' [Citation.] But such error is not structural and is subject to harmless-error review under *Chapman v. California* (1967) 386 U.S. 18 . . . . [Citations.]" (*People v. Gerber* (2011) 196 Cal.App.4th 368, 391.) "In this situation, to find the error harmless, a reviewing court must conclude, beyond a reasonable doubt, that the jury based its verdict on a legally valid theory . . . ." (*People v. Chun* (2009) 45 Cal.4th 1172, 1203.)

Regarding attempted murder, the jury was instructed that it required the "inten[t] to kill [a] person" along with "at least one direct *but ineffective* step toward killing [that] person . . . ." (CALCRIM No. 600, emphasis added.) Thus, assuming the jury followed

17

this instruction, it would have concluded — much as did the court in *Iniguez* — that conspiracy to commit attempted murder was a legally (and thus factually) impossible theory of vicarious liability.

Of course, it is possible that, in an attempt to make sense out of the seeming contradiction, the jury interpreted a conspiracy to *commit attempted murder* as meaning a conspiracy to *attempt to commit murder* — in other words, an agreement to take a step toward killing a person, with the intent to kill that person, but also with the awareness that the step might not be effective. However, this would simply be a conspiracy to commit murder. Under that interpretation, the claimed error vanishes.

Finally, it is not impossible that the jury completely misunderstood or failed to follow the instructions and based the verdict on its own notions of rough justice. "In analyzing the prejudicial effect of error, however, an appellate court does not *assume* an unreasonable jury. Such an assumption would make it virtually impossible to ever find error harmless. An appellate court necessarily operates on the assumption that the jury has acted reasonably, unless the record indicates otherwise." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1127.)

We also find this error harmless for a second, alternative reason. As to Garcia and Joseph Navarro, the jury found the multiple-murder special circumstance not true. As it was correctly instructed (CALCRIM No. 702), the multiple-murder special circumstance requires that the defendant either (1) was the actual killer or (2) acted with the intent to kill. (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 45.) While it did find these

18

defendants guilty of both murders, evidently the jury could not find, beyond a reasonable doubt, that they were actual killers; more important, it also could not find, beyond a reasonable doubt, that they had the intent to kill.  Accordingly, it must *not* have found that they entered into legally impossible conspiracy to commit attempted murder.[9]

Admittedly, as to Samuel Navarro, the jury found the multiple-murder special circumstance true.  Thus, it presumably found that he had the intent to kill.[10]  However, since the jury *failed* to find, beyond a reasonable doubt, that the *other* defendants had the

---

[9]    In their reply briefs, Garcia and Joseph Navarro argue that this reasoning is flawed because it depends on the fallacy of "affirming the consequent."

To illustrate this fallacy, start with a statement of the form, "If P, then Q" — for example, "If Socrates is a man, then Socrates is mortal."  In that case, the statement "Q, therefore P," or, "Socrates is mortal, therefore Socrates is a man," is a fallacy.  This is because there are other ways to be mortal; perhaps Socrates is a woman, a dog, or a bristlecone pine.

However, if we start with a statement of the form, "If *and only if* P, then Q," then the fallacy disappears; in that case, "Q, therefore P" does logically follow.  For example, from "If and only if Socrates is mortal, then he can die," we can conclude, "Socrates can die, therefore he is mortal."

Here, the jury had already found these defendants guilty of two first-degree murders; hence, if *and only if* it could not find, beyond a reasonable doubt, that they had the intent to kill, then it could find the special circumstance not true.

Incidentally, Joseph Navarro in his opening brief, he *conceded* that our interpretation of the jury verdict is correct:  "The jury rejected the notion that [Joseph Navarro] acted with the personal intent to kill in rejecting the charged multiple murder special circumstance allegation as to him . . . ."

[10]    In theory, it may have found that Samuel Navarro was the actual killer.  In light of the evidence, however, this is not a realistic possibility.  There was *no* evidence that he stabbed Moreno.  There *was* evidence that he stabbed Salas, but only in the hip, and Salas's hip wound was not fatal.

intent to kill, evidently it did not find that he *conspired* with any of them to commit attempted murder.

We therefore conclude that the error in instructing on conspiracy to commit attempted murder was harmless under any standard.

C. *Instructions on the Legally Impossible Theory of Conspiracy to Commit Second Degree Implied Malice Murder.*

Defendants also contend the trial court erred by instructing on the legally impossible theory of conspiracy to commit second degree implied malice murder.

CALCRIM No. 416 referred to conspiracy to commit "[m]urder." It did not distinguish between first and second degree murder; moreover, it did not distinguish between second degree express malice murder and second degree implied malice murder. To the contrary, it expressly incorporated "the separate instructions" defining murder. Thus, it never actually stated that conspiracy to commit murder required the intent to kill. Rather, it inferably included conspiracy to commit second degree implied malice murder.

However, there is no such crime as conspiracy to commit second degree implied malice murder. "[C]onspiracy to commit murder requires a finding of intent to kill, and cannot be based on a theory of implied malice." (*People v. Swain* (1996) 12 Cal.4th 593, 607.) "[W]here two or more persons conspire to commit murder — i.e., intend to agree or conspire, further intend to commit the target offense of murder, and perform one or more overt acts in furtherance of the planned murder — each has acted with a state of mind 'functionally indistinguishable from the mental state of premeditating the target

20

offense of murder.' [Citation.]" (*People v. Cortez* (1998) 18 Cal.4th 1223, 1232.) Thus, "all conspiracy to commit murder 'is necessarily "conspiracy to commit [premeditated] first degree murder"' [citation] . . . ." (*Id*. at p. 1226.)

The People argue that there is no reasonable likelihood that the jury understood the instructions, taken as a whole, in an erroneous manner. As they point out, in closing argument, the prosecutor explained that conspiracy to commit murder requires premeditation as well as an intent to kill. However, "[u]nlike jury instructions, principles of law that are expressed only by counsel are not binding on the jury. . . . We cannot presume that the jury followed legal principles that were articulated only by counsel, and not by the court." (*In re Hansen* (2014) 227 Cal.App.4th 906, 922-923.) The jury was given the standard instruction, "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.) We must presume that the jurors followed this instruction. (*People v. Valladares* (2009) 173 Cal.App.4th 1388, 1400.)

The People also argue that the error was harmless. This time, we agree.

Regarding conspiracy to commit murder, the jury was instructed that this required that: (1) "The defendant intended to agree and did agree with one or more of the other defendants to commit murder"; (2) "the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit murder"; and (3) "[o]ne of the defendants . . . committed at least one . . . overt act[] to accomplish murder . . . ."

If the jury found a conspiracy to commit murder, under this instruction, then it necessarily also found that each member of the conspiracy acted with a state of mind "'functionally indistinguishable'" from premeditation. (*People v. Cortez*, *supra*, 18 Cal.4th at p. 1232.) Thus, we see no possibility that it found a conspiracy to commit second degree implied malice murder. In other words, precisely because a conspiracy to commit second degree implied malice murder is legally (and thus factually) impossible, we are convinced, beyond a reasonable doubt, that the jury did not find such a conspiracy.

V

AIDING AND ABETTING INSTRUCTIONS

Defendants raise a number of related challenges to the aiding and abetting instructions.

A.    *Additional Factual and Procedural Background*.

At the request of the prosecution, the trial court gave the following aiding and abetting instructions:

1. CALCRIM No. 400, "Aiding and Abetting: General Principles":

"A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime.

"A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.

22

"Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

2.  CALCRIM No. 401, "Aiding and Abetting: Intended Crimes":

"To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"1.  The perpetrator committed the crime of murder; and/or assault with a deadly weapon and/or assault with force likely to produce great bodily injury, and/or attempted murder;

"2.  The defendant knew that the perpetrator intended to commit the crime.

"3.  Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and

"4.  The defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.

"Someone *aids and abets* a crime if he or she . . . knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

3.  CALCRIM No. 403, "Natural and Probable Consequences (Only Non-Target Offense Charged)":

"To prove that the defendant is guilty of murder, the People must prove that:

23

"1.  The defendant is guilty of assault with force likely to produce great bodily injury or assault with a deadly weapon;

"2.  During the commission of assault with force likely to produce great bodily injury or assault with a deadly weapon, a co-participant in that assault with force likely to produce great bodily injury or assault with a deadly weapon committed the crime of murder; AND

"3.  Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the assault with force likely to produce great bodily injury or assault with a deadly weapon.

"A *co-participant* in a crime is the perpetrator or anyone who aided and abetted the perpetrator.  It does not include a victim or innocent bystander.

"A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.  If the murder was committed for a reason independent of the common plan to commit the assault with force likely to produce great bodily injury or assault with a deadly weapon, then the commission of murder was not a natural and probable consequence of assault with force likely to produce great bodily injury or assault with a deadly weapon.

"To decide whether the crime of murder was committed, please refer to the separate instructions that I will give you on those crimes.

24

"The People are alleging that the defendant originally intended to aid and abet assault with force likely to produce great bodily injury or assault with a deadly weapon.

"If you decide that the defendant aided and abetted one of these crimes and that murder was a natural and probable consequence of that crime, the defendant is guilty of murder. You do not need to a[gree][11] about which of these two crimes the defendant aided and abetted."

B.     *Direct Aiding and Abetting Without Personally Premeditating.*

Defendants contend the trial court erred by instructing that a direct aider and abettor could be guilty of premeditated first degree murder even if he did not personally premeditate. By a "direct" aider and abettor, they mean one who intentionally aids and abets the crime that the perpetrator actually commits, as opposed to an aider and abettor who intends to aid and abet some different crime.

Both those who "directly commit the act constituting the offense" and those who "aid and abet in its commission . . . are principals in any crime so committed." (Pen. Code, § 31.) "'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the *intent* or purpose of *committing, facilitating or encouraging commission of the crime*, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' [Citation.]" (*People v. Delgado* (2013) 56 Cal.4th 480, 486, italics added.)

---

**11**     The trial court misread "agree" as "argue." Defendants do not claim this was error.

25

In addition, under the natural and probable consequences doctrine, "'"'"[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime.'"'" [Citations.]" (*People v. Maciel* (2013) 57 Cal.4th 482, 520.)

Thus, an aider and abettor can be guilty of a nontarget offense even if he or she lacks the mens rea it would otherwise require. "By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. . . . [T]he mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 852.) "The issue 'is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable.' [Citation.]" (*People v. Maciel*, *supra*, 57 Cal.4th at p. 520.)

"'[O]utside of the natural and probable consequences doctrine,'" however, "'an aider and abettor's mental state must be at least that required of the direct perpetrator.' [Citation.]" (*People v. Nunez and Satele*, *supra*, 57 Cal.4th at p. 43.)

Here, CALCRIM No. 400 and No. 401 both referred generally to aiding and abetting a "crime." CALCRIM No. 401 also referred to aiding and abetting specified crimes, including "murder." There was no discussion of the requirements for aiding and

abetting either "first degree" or "premeditated" murder.  Defendants argue that the jury could have understood that, as long as one defendant committed premeditated first degree murder, and a second defendant — intentionally, but without premeditation — helped him commit that crime, the second defendant could be convicted of premeditated first degree murder as a direct aider and abettor.

It has been held that, in general, CALCRIM No. 400 is a correct statement of law; at worst, when there is evidence that the aider and abettor's mens rea was less than the perpetrator's, the instruction is incomplete.  Thus, defendants' failure to request appropriate clarifying or amplifying language below forfeited any challenge to the instruction on appeal.  (*People v. Loza* (2012) 207 Cal.App.4th 332, 350; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163; see also *People v. Mejia* (2012) 211 Cal.App.4th 586, 624 [former CALJIC No. 3.00].)

Separately and alternatively, defendants' challenge lacks merit.  CALCRIM No. 401 specifically stated:  "Someone aids and abets a crime if he or she . . . *knows of the perpetrator's unlawful purpose* and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of *that crime*." (Italics added; italics omitted.)  "This instruction advised the jury that it must base its decision of each appellant's liability not simply on the mental state of the direct perpetrator of the crime, but on that appellant's state of mind and the extent to which he knew of and intended to facilitate the purpose contemplated by the perpetrator." (*People*

*v. Mejia*, *supra*, 211 Cal.App.4th at p. 625.)  It was not enough that the aider and abettor intended to facilitate a lesser crime.

Finally, the asserted error was not prejudicial.  Defendants rely on cases holding that CALCRIM No. 400 erroneously failed to convey the principle that the aider and abettor may be guilty of a lesser offense than the perpetrator when the aider and abettor's mens rea was less than the perpetrator's.  (*People v. Nero* (2010) 181 Cal.App.4th 504, 518; *People v. Samaniego*, *supra*, 172 Cal.App.4th at pp. 1164-1165.)  Here, however, unlike in *Nero* and *Samaniego*, the trial court *also* instructed on the necessary and probable consequences doctrine.  This told the jury specifically how an aider and abettor who did not personally premeditate (or who did not even have the intent to kill) could still be guilty of first degree murder.

Under the circumstances here, we see no way a juror could have found that a defendant was *not* guilty of first degree murder under the natural and probable consequences doctrine but *was* guilty of first degree murder on the mistaken theory that he directly aided and abetted second degree murder.  Thus, the claimed error was harmless under any standard.  (See *People v. Canizalez*, *supra*, 197 Cal.App.4th at pp. 851-852.)

C.    *Aiding and Abetting First Degree Murder Under the Natural and Probable Consequences Doctrine*.

Defendants contend the trial court erred by instructing that, under the natural and probable consequences doctrine, an aider and abettor could be convicted of first degree

murder as long as "[m]urder" — rather than first degree murder — was a natural and probable consequence of the target offense. In their view, an aider and abettor cannot be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine unless *premeditated* murder was reasonably foreseeable. Likewise, an aider and abettor cannot be convicted of first degree *lying-in-wait* murder under the natural and probable consequences doctrine unless *lying-in-wait* murder was reasonably foreseeable.

               1.     *First degree premeditated murder*.

We start with whether the instructions erroneously failed to state that an aider and abettor could not be convicted of premeditated murder under the natural and probable consequences doctrine unless premeditated murder was reasonably foreseeable.

While this appeal was pending, the California Supreme Court reframed this argument. It held that an aider and abettor cannot be convicted of premeditated first degree murder "under the natural and probable consequences doctrine" *at all*; rather, there must be proof that the aider and abettor premeditated personally. (*People v. Chiu* (2014) 59 Cal.4th 155, 166-167.) Here, under *Chiu*, the trial court erred by instructing that an aider and abettor who did not premeditate — indeed, who did not intend to kill at all — could be convicted of first degree murder under the natural and probable consequences doctrine.

The People concede that this was error; they simply argue that it was harmless, for three reasons. Once again, the error can be deemed harmless only if we "conclude,

29

beyond a reasonable doubt, that the jury based its verdict on a legally valid theory . . . ." (*People v. Chun*, *supra*, 45 Cal.4th at p. 1203; see also *People v. Delgado*, *supra*, 56 Cal.4th at p. 490.)

First, the People note that CALCRIM No. 521, as given in this case, started out by stating, "The defendant has been prosecuted for first degree murder under two theories: (1) the murder was willful, deliberate, and premeditated and (2) the murder was committed by lying in wait." They also note that, because the jury found the special circumstance not true as to Garcia and Joseph Navarro, it must have found that they lacked the intent to kill. (See part IV.B, *ante*.) They conclude that the jury must have found these defendants guilty of first degree murder on a lying-in-wait theory, not a premeditation theory.

This assumes that CALCRIM No. 521 limited the jury to these two theories of first degree murder and ruled out a natural and probable consequences theory. The instruction does not support this interpretation. It specified how an individual defendant could be found guilty of first degree murder based on his own premeditation. In other words, it defined the guilt of a perpetrator. The separate aiding and abetting instructions then specified how another defendant could be found guilty of aiding and abetting first degree murder by the perpetrator. Those instructions did not require that the aider and abettor personally premeditate.[12] Indeed, CALCRIM No. 403 stated the opposite — that

_____

[12] By way of analogy: CALCRIM No. 520 stated, "The defendant is charged in Counts 1 and 2 with murder . . . . [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused

*[footnote continued on next page]*

a person who intended only an aggravated assault could nevertheless be guilty of murder (presumably including first degree murder).

Second, the People also note that, in closing argument, the prosecutor indicated that a defendant could not be found guilty of first degree murder on a natural and probable consequences theory; he could be found guilty, at most, of second degree murder. We recognize that a reviewing court can consider a prosecutor's closing argument in deciding whether an ambiguous or potentially confusing instruction was likely to mislead the jury. (E.g., *People v. Ainsworth* (1988) 45 Cal.3d 984, 1032-1033.) Once again, however (see part IV.C, *ante*), the prosecutor's closing argument cannot cure an erroneous instruction simply by contradicting it. (*People v. James* (2000) 81 Cal.App.4th 1343, 1364, fn. 10 ["We do not consider comments by counsel during closing argument to determine whether the error in the instruction was cured."].)

Third, the People argue that the evidence of lying in wait was "strong." We cannot agree. "Lying-in-wait murder consists of three elements: '''(1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . .' [Citations.]''' [Citation.]" (*People v. Russell* (2010) 50 Cal.4th 1228, 1244, fn. omitted.) There was evidence of concealment of purpose —

---

*[footnote continued from previous page]*
the death of another person . . . ." This instruction applied only to a perpetrator; it did not exclude the operation of the aiding and abetting instructions. Thus, it did not mean that each defendant had to have personally caused the death of each victim.

namely the empty knife boxes, which indicated that defendants and their cohorts armed themselves in advance. However, any period of watching and waiting was brief, at best. Garcia started yelling for Arceo almost immediately. Meanwhile, Robles (or Joseph Navarro) confronted Martinez. Immediately after she (or he) punched Martinez, the knives came out.

We acknowledge that "' . . . "[t]he precise period of time is . . . not critical." [Citation.] . . . [A] few minutes can suffice.' [Citations.]" (*People v. Russell*, *supra*, 50 Cal.4th at p. 1244.) Thus, there was *sufficient* evidence of lying in wait; indeed, defendants do not contend otherwise. Even so, however, the evidence was at least equally consistent with a scenario in which defendants provoked a fight pretty much immediately. To hold otherwise would mean that bringing a concealed weapon to a fight constitutes lying in wait, as a matter of law.

Nevertheless, we conclude that the error was harmless for a fourth reason: As we will explain, the jury's verdicts demonstrate that it did find defendants guilty of first degree murder on a lying-in-wait theory, not a premeditation theory.

Even under defendants' interpretation of the instructions, the jury could find each of them guilty of first degree premeditated murder in one of four ways:

1. The defendant was the perpetrator and personally premeditated.

2. The defendant was a direct aider and abettor, in that: (1) another defendant was the perpetrator, (2) the defendant intended to aid and abet the perpetrator in committing murder, and (3) the defendant and/or the perpetrator premeditated.

32

3. The defendant was liable under the natural and probable consequences doctrine, in that: (1) another defendant was the perpetrator, (2) the defendant intended to aid and abet the perpetrator in committing aggravated assault, and (3) the perpetrator premeditated.

4. The defendant was a conspirator, in that: (1) another defendant was the perpetrator, (2) the defendant conspired with the perpetrator to commit aggravated assault, attempted murder, or murder, and (3) the perpetrator premeditated.

To put it more simply: To rely on a premeditation theory, the jury had to find that *somebody* premeditated.

Again, however, the jury found that neither Garcia nor Joseph Navarro had the intent to kill. A fortiori, it must have found that they did not premeditate. The jury did find Samuel Navarro guilty of the attempted murder of Martinez; thus, it evidently found that he had the intent to kill. However, it also found that the attempted murder was *not* willful, deliberate, and premeditated. On these facts, we see no way the jury could have found that, even though Samuel Navarro did not premeditate as to Martinez, he did premeditate as to Moreno or Salas.[13] Thus, no matter who the jury found to be the

---

[13] Incidentally, we also see no way the jury could have found that Samuel Navarro was the perpetrator of the murder of either Salas or Moreno. The evidence showed that Garcia and/or Joseph Navarro hit or stabbed Moreno; there was no evidence that Samuel Navarro was the perpetrator. Likewise, the evidence also showed that Garcia hit or stabbed Salas in the torso, and Salas died from a single stab wound to the left chest. While there was evidence that Samuel Navarro hit or stabbed Salas in the "hips and buttocks area," that wound was not fatal.

33

perpetrator of the two murders — indeed, even if it was unable to decide who the perpetrator was — its verdict shows that it did not find that *any* of the defendants premeditated.

In sum, under the instructions, as given, the only way the jury logically could have come to the verdicts that it did was by relying on a lying-in-wait theory.

2. *First degree lying-in-wait murder.*

According to defendants, *Chiu* applies to both premeditated and lying-in-wait murder. Hence, in their view, an aider and abettor cannot be convicted of lying-in-wait murder under the natural and probable consequences doctrine at all; rather, there must be proof that he or she personally lay in wait.

*Chiu*, however, dealt exclusively with premeditated murder. It did not so much as mention lying-in-wait murder. It also acknowledged that ordinarily, "[a]ider and abettor culpability under the natural and probable consequences doctrine is vicarious in nature. [Citation.] 'By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. . . . [Citation.]" (*People v. Chiu*, *supra*, 59 Cal.4th at p. 164.) We are bound by the Supreme Court's earlier opinions (e.g., *People v. Prettyman* (1996) 14 Cal.4th 248, 262-263), except to the extent that they were overruled in *Chiu* with respect to premeditated murder. Indeed, even after *Chiu*, the Supreme Court has stated that, under the natural and

34

probable consequences doctrine, "an aider and abettor, like a conspirator, is liable for unintended crimes." (*People v. Smith* (2014) 60 Cal.4th 603, 615.)

We also note that the Supreme Court's reasons for carving out premeditated murder in *Chiu* do not apply to lying-in-wait murder. It explained that the mental state of "willfulness, premeditation, and deliberation . . . is uniquely subjective and personal" and "has no effect on the resultant harm. The victim has been killed regardless of the perpetrator's premeditative mental state." (*People v. Chiu*, *supra*, 59 Cal.4th at p. 166.)

Unlike premeditation, lying in wait is not really a mental state at all. As discussed in part V.B, *ante*, it requires concealment of purpose, a substantial period of watching and waiting, and a surprise attack. Thus — except to the extent that the perpetrator must have an illegal "purpose" — it consists of conduct. "The statute assumes that if the means of the murder are by lying in wait, those means adequately establish the murder as the equivalent of a premeditated murder without any additional evidence of the [perpetrator]'s mental state." (*People v. Hyde* (1985) 166 Cal.App.3d 463, 475.) In addition, lying in wait does have an effect on the subsequent harm. Admittedly, in hindsight, the victim is just as dead. However, the perpetrator's concealment of purpose, watching and waiting, and surprise attack all make it more likely that the attack, when it comes, will succeed.

Hence, we conclude that an aider and abettor can be guilty of lying-in-wait murder under the natural and probable consequences doctrine without any evidence that he or she personally lay in wait (or intended the perpetrator to lie in wait).

This brings us to whether the instructions should have stated that an aider and abettor could not be convicted of lying-in-wait murder under the natural and probable consequences doctrine unless lying-in-wait murder was reasonably foreseeable.

Under *People v. Chiu*, *supra*, 59 Cal.4th 155, no such instruction was required. There, the Supreme Court stated: "We have never held that the application of the natural and probable consequences doctrine depends on the foreseeability of every element of the nontarget offense. Rather, in the context of murder under the natural and probable consequences doctrine, cases have focused on the reasonable foreseeability of the *actual resulting harm* or the *criminal act* that caused that harm. [Citations.]" (*Id*. at p. 165, fn. omitted, emphasis added.) It cited cases that asked whether a "shooting" or a "fatal shooting" (rather than a murder) was a natural and probable consequence of the target crime. (*Ibid*., citing, among others, *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1450; *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376.) In fairness, we note that this language in *Chiu* was dictum. "However, even dictum from our Supreme Court is considered 'highly persuasive.' [Citations.]" (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1336.)[14]

---

[14]    Before *Chiu*, the only relevant authority was *People v. Woods* (1992) 8 Cal.App.4th 1570. *Woods* held that "in determining aider and abettor liability for crimes of the perpetrator beyond the act originally contemplated, the jury must be permitted to consider uncharged, necessarily included offenses where the facts would support a determination that the greater crime was not a reasonably foreseeable consequence but the lesser offense was such a consequence." (*Id*. at p. 1588.) Thus, it would support defendants' position.

*[footnote continued on next page]*

36

Defendants further argue that, assuming they can be found guilty of first degree murder under the natural and probable consequences doctrine, even if lying in wait was not foreseeable, then the natural and probable consequences doctrine is unconstitutional. This argument presumes that the reasonable foreseeability of the lying in wait is an element of the offense for purposes of *Apprendi v. New Jersey* (2000) 530 U.S. 466. For the reasons already discussed, however, we disagree; the relevant element of the offense is that the perpetrator did, in fact, lie in wait, regardless of whether the lying in wait was reasonably foreseeable.

VI

THE CONSTITUTIONALITY OF

THE NATURAL AND PROBABLE CONSEQUENCES DOCTRINE

Defendants contend that the natural and probable consequences doctrine violates the separation of powers, as well as Penal Code section 6 ["No act or omission . . . except as prescribed or authorized by this Code"], because it is a nonstatutory, judicially created crime.

---

*[footnote continued from previous page]*
Justice Sparks disagreed; he would have held that "[w]hat is crucial is that the aider and abettor either knew or should have known that a killing was a likely result . . . , not whether this foreseeable killing might constitute first degree murder as opposed to second degree murder or some variety of manslaughter." (*Id*. at p. 1603 [conc. opn. of Sparks, J.].)

Because *Woods* is a bare majority opinion of a sister court, decided before *Chiu*, we consider *Chiu* to be more persuasive.

37

The People respond that "[t]he Supreme Court . . . repeatedly has rejected constitutional challenges to the doctrine." However, it has never, to the best of our knowledge, ever considered — much less rejected — this particular constitutional challenge. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 124-125; *People v. Richardson* (2008) 43 Cal.4th 959, 1021-1022.)

""""[T]he power to define crimes and fix penalties is vested exclusively in the legislative branch." [Citation.]' [Citation.]" (*People v. Chun*, *supra*, 45 Cal.4th at p. 1183.) "Some statutory or regulatory provision must describe conduct as criminal in order for the courts to treat that conduct as criminal. [Citation.]" (*Ibid.*, fn. omitted.)

"Although there are no common law crimes in this state [citation], we are free to look to the common law to supply the requisite certainty to an existing statute. [Citation.]" (*People v. Heitzman* (1994) 9 Cal.4th 189, 212, fn. 19.) Thus, in *People v. Chun*, *supra*, 45 Cal.4th 1172, the Supreme Court held that the second degree felony-murder rule does not violate the separation of powers. It explained that Penal Code section 188 defines malice in terms of "an abandoned and malignant heart," and "[t]he willingness to commit a felony inherently dangerous to life is a circumstance showing an abandoned and malignant heart" (*Chun*, at pp. 1187-1188); thus, the second degree felony-murder rule is a judicial "interpretation" of Penal Code section 188. (*Chun*, at p. 1184.)

Here, similarly, the natural and probable consequences doctrine is a judicial interpretation of Penal Code section 31, which provides, "All persons concerned in the

commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." This requires the courts to decide what the Legislature meant by "aid and abet." "'It will be presumed . . . that in enacting a statute the Legislature was familiar with the relevant rules of the common law, and, when it couches its enactments in common law language, that its intent was to continue those rules in statutory form.' [Citation.]" (*People v. Chun*, *supra*, 45 Cal.4th at p. 1184.) As Joseph Navarro, at least, recognizes, the natural and probable consequences doctrine was a well-established aspect of the common law of aiding and abetting. (*People v. King* (1928) 30 Cal.App.2d 185, 202-203 and authorities cited.)

We therefore conclude that the doctrine does not violate either the separation of powers or Penal Code section 6.

VII

PROSECUTORIAL MISCONDUCT BY MISSTATING THE LAW

REGARDING LYING IN WAIT IN CLOSING ARGUMENT

Garcia and Joseph Navarro contend that the prosecutor committed misconduct by misstating the law in closing argument.

A.     *Additional Factual and Procedural Background*.

In closing argument, the prosecutor stated:

"[T]he liability for these crimes is established at the point that they make the plan. The liability is established back at home when they form that agreement. [¶] . . . [¶] . . .

39

" . . . [I]f the agreement is 'Let's go kill people; let's go take lives,' that would be first-degree, willful, deliberate, premeditated murder.

"If the plan was 'Let's go launch a surprise attack,' *this doesn't require an intention to kill*. This is 'Let's go launch a surprise attack" and, if, as a consequence of that attack people die, it's first-degree murder. And *it's first-degree murder by lying in wait*.

"If the agreement was simply 'Let's go stab people' — not a surprise attack — 'Let's just go over there wielding our knives and stab a bunch of people,' then that would also be murder if a murder was a natural and probable consequence of a stabbing.

" . . . If the agreement was 'Let's go hurt people; let's go beat people up severely,' then, again, if during the course of that attack somebody gets carried away and kills somebody, it is still second-degree murder from natural and probable consequences."**15** (Italics added.)

At other points in his argument, the prosecutor reiterated that a lying-in-wait theory of first degree murder did not require the intent to kill.

Defense counsel did not object to any of these statements.

B.    *Analysis*.

"As a general rule, '"[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to

---

**15**    Evidently the prosecutor also displayed a "diagram" or "flowchart" listing these options.

the action and also requested that the jury be admonished to disregard the perceived impropriety.'" [Citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) Here, defense counsel forfeited the claimed prosecutorial misconduct by not objecting and not requesting an admonition.

Garcia and Joseph Navarro therefore contend that this constituted ineffective assistance of counsel. As already discussed, in part III, *ante*, this requires that they show prejudice from the asserted ineffective assistance.

"[Penal Code] section 189 provides that '[a]ll murder which is perpetrated by means of . . . lying in wait . . . is murder of the first degree; . . .' The statute assumes that if the means of the murder are by lying in wait, those means adequately establish the murder as the equivalent of a premeditated murder without any additional evidence of the defendant's mental state. [Citation.] Nonetheless, the prosecution must first establish a murder within the meaning of [Penal Code] section 187 — that is, a killing with malice — before the means of the killing take on significance. [Citation.]" (*People v. Hyde*, *supra*, 166 Cal.App.3d at p. 475; accord, *People v. Stanley* (1995) 10 Cal.4th 764, 794; *People v. Laws* (1993) 12 Cal.App.4th 786, 793-794.)

"A conviction for murder requires the commission of an act that causes death, done with the mental state of malice aforethought (malice). [Citation.] Malice may be either express or implied. [Citation.] Express malice is an intent to kill. [Citation.] Implied malice does not require an intent to kill. Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to

human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses. [Citation.]" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)

First degree lying-in-wait murder can be committed without the intent to kill, although, in that case, it does require implied malice. (*People v. Laws*, *supra*, 12 Cal.App.4th at pp. 794-795.) Thus, the prosecutor's statements to the effect that a lying-in-wait theory of first degree murder does not require an intent to kill correctly stated the law.[16]

The closer question is whether the prosecutor *also* stated that *implied malice* is not required. He did state, "This is 'Let's go launch a surprise attack" and, if, as a consequence of that attack people die, it's first-degree murder." This could be understood to mean that *all* that is required is an agreement to launch a "surprise attack" plus resulting death.

In this case, however, if the jury found a surprise attack at all, that surprise attack was necessarily carried out with at least implied malice. Defendants armed themselves with knives, started a fight, and then stabbed the victims in the chest.

Thus, this case is closely analogous to *People v. Boyette* (2002) 29 Cal.4th 381. There, in closing argument, the prosecutor said, in part, "'The law says lying in wait is so serious, so heinous, that it is automatically first degree. It is never second degree. [¶] It

---

[16] Counsel for Garcia, in her closing argument, said that lying in wait *did* require intent to kill. The prosecutor objected that this misstated the law, and the trial court sustained the objection. Garcia does not claim this was error.

is a substitution for malice.'"  (*Id*. at p. 435.)  The Supreme Court stated, "We perceive no misstatement of law. . . .  Although defendant argues the prosecutor erroneously stated that lying in wait is a substitute for malice (instead of premeditation and intent to kill), there is no functional difference in these circumstances:  if the jury found defendant lay in wait and thus necessarily premeditated and intended the killings, his argument that he nevertheless lacked malice is — on these facts — untenable."  (*Id*. at pp. 435-436.)  Here, similarly, if the jury found lying in wait, in that defendants agreed to bring concealed knives and to watch and wait before using them to launch a surprise attack on the victims, an argument that they lacked malice was untenable.  Accordingly, defense counsels' failure to object and to request an admonition could not possibly have prejudiced defendants.

Defendants argue that the jury could have found that they lacked malice because they were responding to adequate provocation, and thus they were guilty of no more than voluntary manslaughter.  They point to the evidence that, after they arrived at the trailer side of the property, Arceo was jumping up and down and cocking his fists; also, Martinez threw gang signs and called Robles a bitch.  However, as the People aptly point out, the murder victims were Salas and Moreno, not Arceo or Martinez.  For purposes of voluntary manslaughter, "'"The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim."  [Citation.]'  [Citation.]"  (*People v. Verdugo* (2010) 50 Cal.4th 263, 293.)

43

In any event, the prosecutor stated that a lying-in-wait theory required proof of a "plan" or "agreement" made "back at home" to "'launch a surprise attack.'" Thus, he made it clear that, if defendants acted spontaneously in response to some new provocation at the scene, lying in wait would not apply.

Finally, defendants argue that the jury could have found them guilty of only second degree murder based on provocation. In that respect, however, the prosecutor stated the law correctly. Even if defendants did not premeditate (i.e., if they killed intentionally and in response to provocation, but the provocation was inadequate), the crime could still be first degree murder based on lying in wait.

## VIII

## CRUEL AND UNUSUAL PUNISHMENT

Garcia and Joseph Navarro contend that, because they were juveniles when the crimes were committed, their sentences of 50 years to life constitute cruel and unusual punishment.

A.      *Additional Factual and Procedural Background.*

Garcia and Joseph Navarro were each convicted on two counts of first degree murder. The prescribed sentence on each count was 25 years to life. (Pen. Code, § 190, subd. (a).) Realistically,[17] the only discretionary sentencing decision the trial court had

---

[17]      Technically, the trial court could have granted probation if it found either that a defendant was not armed with a deadly weapon or that this was an "unusual case[]." (Pen. Code, § 1203, subd. (e)(1).) On the facts here, it was almost impossible that it would make these findings.

to make was whether to run the sentences concurrently or consecutively. (Pen. Code, § 669, subd. (a).)

Counsel for Garcia requested concurrent sentencing. The prosecutor urged the trial court to sentence Garcia consecutively. He asserted that a sentence of 50 years to life "realistically prohibit[s] any chance of parole . . . he will be 67 before he's ever eligible for parole. And, life being what it is in prison, I think it would be unrealistic that at 67 years old somebody might be paroled or that they would reach their parole date." Thus, he argued, "I'm asking the court to sentence him to 50 to life to effectively erase any chance that he has of ever being granted parole." He indicated, however, that he was "not opposed" to sentencing Joseph Navarro concurrently.

The trial court concluded that, for multiple reasons, which it stated on the record, it should "impose the maximum allowable as to each defendant by law." It therefore ran both Garcia's and Joseph Navarro's sentences consecutively.

B.    *General Legal Background*.

"[F]or a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole." (*Graham v. Florida* (2010) 560 U.S. 48, 74.) Even in a homicide case, "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" (*Miller v. Alabama* (2012) 567 U.S. ___, ___ [132 S.Ct. 2455, 2460].) *Miller* declined to impose "a categorical bar on life without parole for juveniles . . . ." (*Id*. at p. 2469.) It held, however, that "a judge or jury must have the opportunity

45

to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." (*Id*. at p. 2475.) Such mitigating circumstances potentially include (1) the juvenile offender's "chronological age and its hallmark features — among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "the family and home environment that surrounds him"; (3) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) "incompetencies associated with youth — for example, his inability to deal with police officers or prosecutors . . . or his incapacity to assist his own attorneys"; and (5) the possibility of rehabilitation . . . ." (*Id*. at p. 2468.)

C. *Forfeiture*.

Garcia and Joseph Navarro did not raise their present contention in the trial court. Accordingly, the People argue that it has been forfeited.

Ordinarily, a claim of cruel and unusual punishment is "fact specific"; as a result, it is forfeited if not raised below. (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 27; accord, *People v. Kelley* (1997) 52 Cal.App.4th 568, 583; *People v. Ross* (1994) 28 Cal.App.4th 1151, 1157, fn. 8.)

Here, however, Garcia and Joseph Navarro rely on *Miller*'s rule flatly forbidding a mandatory sentence of life without parole for a juvenile. Thus, they are raising a pure question of law, presented on undisputed facts. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1368.) This constitutes an exception to the general forfeiture rule. Therefore, we

may consider it for the first time on appeal. (*People v. Runyan* (2012) 54 Cal.4th 849, 859, fn. 3; *People v. Hines* (1997) 15 Cal.4th 997, 1061.)

D.    *Merits*.

We begin with the question of whether Garcia and Joseph Navarro's sentences are the equivalent of life without parole.

In *People v. Caballero* (2012) 55 Cal.4th 262, our Supreme Court held that a sentence of 110 years to life is the equivalent of life without parole for purposes of *Miller*. (*Caballero*, *supra*, at pp. 265, 268.) It looked to whether the defendant's "parole eligibility date . . . falls outside [his] natural life expectancy . . . ." (*Id*. at p. 268; see also *id*. at p. 267, fn. 3.) It defined life expectancy as "the normal life expectancy of a healthy person of defendant's age and gender living in the United States." (*Id*. at p. 267, fn. 3; see also *People v. Perez* (2013) 214 Cal.App.4th 49, 57-58.)

In 2007, when Garcia turned himself in, he was 17. We take judicial notice[18] that the life expectancy for a Hispanic male aged 17 was approximately 62 years. (National Vital Statistics Reports, United States Life Tables, 2010, at p. 29, available at <http://www.cdc.gov/nchs/data/nvsr/nvsr63/nvsr63_07.pdf>.) Thus, his expected year of death was approximately 2069 (i.e., at age 79). His parole eligibility date, after applying presentence custody credits, was approximately 2057 (i.e., at age 67). In sum, then, his life expectancy was substantially beyond his parole eligibility date.

---

**18**    We gave the parties notice in our tentative opinion of our intent to take such judicial notice. (Evid. Code, §455, subd. (a).)

47

Joseph Navarro differs from Garcia mainly because he was not arrested until 2009, when he was 19. The life expectancy for a Hispanic male aged 19 was approximately 60 years (United States Life Tables, 2010, *supra*, at p. 29), so like Garcia, his expected year of death was also approximately 2069 (i.e., at age 79). His parole eligibility date, after applying presentence custody credits, was approximately 2059 (i.e., at age 69). Thus, his life expectancy, too, was substantially beyond his parole eligibility date.

Joseph Navarro argues that "a sentence that gives a juvenile offender a remote mathematical chance of parole at the very end of his life . . . goes against everything *Miller* stands for." Not so. Any rule that applies only to juvenile offenders inherently requires some Procrustean line-drawing. For example, a defendant aged 17 years, 364 days at the time of the offense can invoke *Miller*; a defendant aged 18 years cannot. (*People v. Abundio* (2013) 221 Cal.App.4th 1211, 1220-1221.) Similarly, "[t]here is a bright line between LWOPs and long sentences *with* eligibility for parole *if* there is some meaningful life expectancy left when the offender becomes eligible for parole." (*People v. Perez*, *supra*, 214 Cal.App.4th at p. 57.) Even assuming a defendant must be given the benefit of a close call, here both defendants' life expectancies exceeded their minimum parole periods by at least 10 years — more than one-eighth of their projected lifespans; this is a substantial period.

Garcia relies on the prosecutor's statement in the trial court that the sentence "realistically prohibit[s] any chance of parole . . . ." However, the prosecutor was not talking about the application of *Miller*, which, we repeat (see part VIII.B, *ante*), defense

counsel never raised below. Rather, he was trying to explain why a sentence of 50 years to life, rather than 25 years to life, was nevertheless appropriate.

Separately and alternatively, we also reject the cruel and unusual punishment claim because a sentence of 50 years to life was discretionary, not mandatory. The trial court also had the alternative of sentencing these defendants concurrently, and thus to only 25 years to life. They do not argue that a sentence of 25 years to life is the equivalent of life without parole. In deciding whether to sentence concurrently or consecutively, the trial court could consider "[a]ny circumstances in aggravation or mitigation . . . ." (Cal. Rules of Court, rule 4.425, subd. (b)); see also Cal. Rules of Court, rules 4.408(a), 4.421, 4.423.) These could include youth, along with all the other mitigating circumstances listed in *Miller*.

Finally, Joseph Navarro argues that his sentence "may be" cruel and unusual under the California constitution, and therefore his trial counsel rendered ineffective assistance by failing to raise this issue. (Capitalization altered; bolding omitted.) However, the record, as it now stands, does not indicate that the sentence was cruel and unusual under this standard. Thus, he cannot show either that his defense counsel was ineffective or that the omission was prejudicial.

We therefore conclude that Garcia and Joseph Navarro have not shown that their sentences constituted cruel and unusual punishment.

## IX

### JOSEPH NAVARRO'S PRETRIAL CUSTODY CREDIT

Joseph Navarro contends that the trial court miscalculated his pretrial custody credit.

Joseph Navarro was arrested on April 8, 2009.[19] He remained in custody until he was sentenced on September 28, 2012. This represented a total of 1,269 days in actual presentence custody. (See *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.) The trial court, however, gave him only 1,255 days of presentence custody credit. (See Pen. Code, § 2900.5, subd. (a).)

The People concede the error. Accordingly, we will give Joseph Navarro 14 more days of pretrial custody credit.

## X

### EXCESSIVE PAROLE REVOCATION RESTITUTION FINE

Garcia and Joseph Navarro contend that the trial court erred by imposing parole revocation restitution fines on them in the amount of $10,000.

The trial court ordered Garcia and Joseph Navarro to pay restitution fines in the amount of $480 (Pen. Code, § 1202.4, subd. (b)); it imposed but suspended parole revocation restitution fines in the amount of $10,000 (Pen. Code, § 1202.45).

---

[19]     Actually, the evidence was in conflict; Joseph Navarro may have been arrested on April 8, April 9, or April 10. Understandably, he relies on the earliest of these three dates. As the People do not challenge his calculations, we likewise accept them.

As the People concede, the trial court erred. The amount of a parole revocation restitution fine must be identical to the amount of the restitution fine. (Pen. Code, § 1202.45, subd. (a).) The People do not contend that we should remand for redetermination of the amount of both fines; we deem them to have forfeited any such contention. Accordingly, we will reduce the parole revocation restitution fine to $480.

XI

JOINT AND SEVERAL LIABILITY FOR RESTITUTION

Garcia and Joseph Navarro contend that the abstract of judgment is erroneous because it fails to reflect the fact that the trial court ordered direct victim restitution liability to be joint and several.

A. *Additional Factual and Procedural Background.*

The trial court ordered all three defendants to pay $15,184.34 in direct victim restitution (Pen. Code, § 1202.4, subd. (f)), for which they would be jointly and severally liable.

The abstracts of judgment recite that each defendant was ordered to pay $15,184.34 in direct victim restitution. With respect to Garcia and Joseph Navarro, they also state that direct victim restitution is to be paid "individually/collectively."

B. *Analysis.*

The People argue that the notation that direct victim restitution is to be paid "individually/collectively" is sufficient. Garcia and Joseph Navarro argue that it was not sufficient because their abstracts of judgment do not indicate who their codefendants are.

They do not explain why it is necessary for the abstract of judgment to include this information. It is up to the Judicial Council to prescribe an abstract of judgment form. (Pen. Code, § 1213.5.) The form it has prescribed (form CR-292) does not have a box or a blank for stating whether restitution is joint and several; a fortiori, it does not have a place to list the names of any co-obligors. This strongly suggests that a direct victim restitution order can be enforced even without this information.

A restitution order is enforceable as a civil judgment. (Pen. Code, §§ 1202.4, subds. (a)(3)(B), (i), 1214, subd. (b).) Penal Code section 1214, subdivision (b) states, that "[u]pon the victim's request, the court shall provide the victim in whose favor the order of restitution is entered with a certified copy of that order . . . ." The California Victim Compensation and Government Claims Board is also entitled to a certified copy of the court order. (Pen. Code, § 1202.4, subd. (p).) This indicates that the payment and collection process is driven by the trial court's restitution order, not the abstract.

Nevertheless, if only out of an excess of caution, because a new abstract must be prepared anyway (see parts IX and X, *ante*), we will direct the trial court clerk to list the names of all codefendants who are jointly and severally liable.

XII

DISPOSITION

The judgments are modified, as follows:

1. Joseph Navarro is awarded 14 additional days of pretrial actual custody credit, for a total of 1,269. (See part IX, *ante*.)

52

2.  Garcia's and Joseph Navarro's parole revocation restitution fines are reduced to $480.  (See part X, *ante*.)

The judgments as modified are affirmed.

The clerk of the superior court is directed to prepare new sentencing minute orders and new abstracts of judgment for Garcia and Joseph Navarro, reflecting these modifications.  The new abstracts shall specifically recite that these defendants' liability for direct victim restitution is joint and several with respect to each other and with respect to Samuel Navarro.  (See part XI, *ante*.)  The clerk of the superior court is further directed to forward certified copies of the amended abstract to the Director of the Department of Corrections and Rehabilitation.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ

P. J.

We concur:

HOLLENHORST

J.

McKINSTER

J.